UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
MAR - 6 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

VALDA T. JOHNSON, )
3600 TUPELO COURT )
WOODBRIDGE, VA 22192 )
(703) 590 – 1137 )
                    )
    Plaintiff,       )
                    )
    v.               )
                    )
ELAINE L. CHAO,     )
Chairwoman,         )
                    )
    and             )
                    )
BRADLEY BELT,       )
Executive Director, )
PENSION BENEFIT GUARANTY CORP.,)
1200 K STREET, N.W. )
WASHINGTON, D.C. 20005 – 4026 )
(202) 326 4100      )
                    )
    Defendants.      )

CASE NUMBER 1:06CV00399
JUDGE: Ellen Segal Huvelle
DECK TYPE: Employment Discrimination
DATE STAMP: 03/06/2006

JURY ACTION

**COMPLAINT**

**(EMPLOYMENT DISCRIMINATION AND RETALIATION)**

**Introduction**

1.  This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Equal Opportunity Act of 1972, 42 US.C., and as further amended by Section 102 of the Civil Rights Act of 1991, 42 U.S.C., to remedy vagrant acts of discrimination and retaliation in employment practices by the Pension Benefit Guaranty Corporation (the PBGC)

against the plaintiff because of her race, color, religion, sex, and in retaliation for her having engaged in protected EEO and civil rights activity. The PBGC has been involved in continuing violations of plaintiff's rights with regard to Title VII, because plaintiff's race, color, religion, sex and in that plaintiff continuously engaged in protected EEO and civil rights activity on her behalf and on behalf of others.

### Jurisdiction

2.   This Court has subject matter jurisdiction over the claims raised herein pursuant to Title VII of the Civil Rights Act of 1964, as amended, under 42 U.S.C., plaintiff having exhausted all *available* administrative remedies on her claims as of the date the instant civil action has been filed.

### Venue

3.   Venue is proper in the District of Columbia as the actions that form the basis of the claims contained in this case arose here in the District of Columbia, the plaintiff's personnel records at the Pension Benefit Guaranty Corporation are maintained here, and plaintiff works for the Pension Benefit Guaranty Corporation in this judicial district.

## Parties

4.  Plaintiff is a brown (black) African American (of mixed descent) citizen of the United States of America, and is a resident of the state of Virginia. She is currently employed, and at all times relevant to this complaint was employed by the Pension Benefit Guaranty Corporation. She is currently as GS-1510-13 Actuary in the Corporation's Insurance Operations Department (now renamed BAPD), either in Trusteeship Processing Division ( hereinafter, "TPD") #3 or #6.

5.  Defendants are Elaine L. Chao and Bradley Belt, the Chairwoman and the Executive Director, respectively, of the Pension Benefit Guaranty Corporation (hereinafter "the PBGC"). Either one or the other (or both acting together) is the head of the PBGC, which is an agency within the Executive Branch of the Government of the United States that has had more than 500 employees in at least 20 calendar weeks during the past year. In short, as its Chairman and as its Executive Director, either Ms. Chao or Mr. Belt, or both together, are responsible for the personnel actions, omissions, and practices within PBGC. Each is here sued in her/his capacity as head of the PBGC.

## Statement of Facts

6. Plaintiff is a brown (black), African American (of mixed descent) female who has confessed Christianity (Baptist). She is currently a GS-1510-13 Actuary with the PBGC's Insurance Operations Department (recently renamed "BAPD"), somewhere between Trusteeship

Divisions # 3 and # 6. She has been at this grade level since October of 1997, though many of her actuarial co-workers, including those with less applicable experience, have been promoted. She has been rated Outstanding for five or six years and recently rated down to Excellent because in retaliation for her EEO activity and her court case. After encountering discrimination from a previous manager in 1997 and 1998, plaintiff became involved in EEO and Union activity. She served, with dignity and conviction, as the Union president of the Local Union, NAGE Local R3-77, for almost five years. She represented the Local and its members in EEO institutional and EEO personal complaints and arbitrations against the PBGC. She also had to represent herself in EEO informal proceedings. Her personal Title VII claims include discrimination because of race, color, religion, sex, and retaliation and interference with work relationships. Her claims, most specifically, include numerous denials of promotions. (see attachments)

7. In 1988, plaintiff graduated from Howard University, a historically black institution, with a Bachelors degree in Insurance, with a concentration in Actuarial Science. When hired by the PBGC, plaintiff had completed 110 credits with the Society of Actuaries. Most actuaries at the PBGC don't have exam credits with the Society of Actuaries or credentials. In fact, PBGC did not require it for many of the actuarial positions. Having credits or credentials is like pursuing higher education, only harder at times, because of the stringent testing. Plaintiff had also worked for two prestigious actuarial consulting firms, giving her more hands-on, realistic actuarial and pension experience (pension concepts, actuarial concept, pension systems) than her peers in many of the vacancies at question.

8. Plaintiff has been employed with the PBGC since April of 1996, participated in informal EEO counseling in 1997 and 1998 (because of race, sex, and religion), became involved with Union negotiations in 1997 because of EEO issues, and became president of NAGE Local R3-77 in April of 1999 and was removed from office (in bad faith) by the National Union, who acquiesced with the PBGC management, in November of 2003.

9. In the spring of 2000, the plaintiff, on behalf of Union members filed an EEO institutional grievance against the PBGC, because the PBGC was in violation of EEO- directive MD-110. Because this grievance lead to arbitration and a favorable decision for the Local, the PBGC discriminated against and retaliated against the plaintiff because of her race, sex, religion, and her EEO activity. The plaintiff had previously been involved in EEO counseling against the friend (Ray Collins) of the Chief Management Officer (CMO - title now changed by the PBGC) (John Seal) for sex, religion and race. Plaintiff had later questioned the CMO's roles as head of Human Resources, head of Budget, and head of the EEO office, (and head of the Union in his partnership with the previous Union, NTEU) by signing an institutional grievance. NAGE official told plaintiff she had to sign the grievance as Local president. Because she carried forth the grievance and arbitration on behalf of employees (based also on their wishes), she was retaliated against. Because plaintiff continued to raise concerns of "unequal" opportunity for herself and her black co-workers in the actuarial profession and in other disciplines, she was ostracized and denied promotions. In the fall of 2001, plaintiff met with the CMO, who was also still the director of the EEO office to discuss retaliation (memo by Sharon Barbee-Fletcher, who previously threatened Johnson's reputation) by the agency and the denial of opportunities for

African American actuaries. On one hand, CMO stated that "words hurt, don't they" as he referenced articles that had written in the Local Union's newsletter concerning his involvement in the EEO system. When plaintiff shared her belief of unfairness and "unequal opportunities" to African American actuaries, the CMO said he would look into to it. In fact, not long after, the black female actuaries at that time who had concerns were promoted, with the exception of the plaintiff. The plaintiff was left behind, although she then had more applicable pension experience than them all. She had been hired at a higher grade than them all. Because the plaintiff eventually filed an EEO grievance which lead to an arbitration, the PBGC politically strong armed the National Union in undermining efforts of plaintiffs in finding justice through an administrative process other than court. The EEO arbitration was to deal with the issues mentioned above. Though the National Union acquiesced with PBGC management stating the case had little merit, there was evidence that showed that one applicant was hired, instead of Ms. Johnson, at the GS-14 level after being rated "zero" in the most important quality ranking factor. Ms. Johnson had rated qualified in all areas. Another candidate was hired at the GS-14 level, after Ms. Johnson refused to agree to the ratification of the collective bargaining agreement. Then, data was put together to allegedly show that Ms. Johnson had a bad interview. At first, it was stated that she was not on point, though she had consulted the experts, as labeled by the chief actuary, on the topic. In essence, both PBGC and the National NAGE Union acquiesced with each other to destroy the career opportunities, mental stability, destroy opportunities for justice, and ruin the reputation of the plaintiff because of her sex, color, race, religion, and certainly, in retaliation for her outspokenness against discrimination under Title VII of the Civil Rights Act. At the time of many of plaintiff's concerns about equal opportunity, many African Americans

were overlooked. As a result of those spoken concerns, many have been promoted since 2001. In fact, a study by Joseph Grant, previous EEO director after John Seal, states that there was an issue with promotion minorities to the GS-14 level. Plaintiff has had to file a string of EEO complaints to protect her job, the welfare of her family, and her sanity because of multiple acts of discrimination and retaliation of the PBGC (who has again gained power over the Local Union, who was supposed to be there to protect the rights of employees and members, and certainly the rights and protections of the Local president.). Indeed, much of these issues could have been resolved much sooner as plaintiff has requested outside (of the PBGC) EEO counseling, mediation, informal inside (of the PBGC) EEO counseling, and mediation during the EEO arbitration. PBGC refused to make good on remedies, because PBGC believes it doesn't have to as long as they get away legally through legal games and tactics. Plaintiff has had her character degraded as management official inappropriately raised questions about the paternity of her daughter. Plaintiff is the wife of a Baptist minister. Plaintiff has been harassed as she tried to receive leave approval from HRD for her burned child, as the child sit in car with relative. Though plaintiff had valid doctors' excuses, HRD official insisted upon calling the physician herself without the approval of the plaintiff.

10. In October of 2004, after harassment, interference with the EEO arbitration, expediting and manipulation of work, interference with plaintiff's ability to attend the Local's trusteeship hearing, and mental manipulation by the PBGC (and the National Union), plaintiff filed to sue the PBGC. That case reference is "1:04CV01848" and a copy is attached hereto. This action replaces that suit in that while many of the decisions on amendments to the original

suit to be made by the judge were stayed in hopes of settlement, many dates and deadlines have now become due. Therefore, this suit supercedes the previous suit and incorporates many of issues in a more timely manner. In fact, after an entire year and a month, the EEOC suddenly made a decision on an appeal of the plaintiff's EEO arbitration decision. Though the plaintiff had the right to bring the issues to court after 180 days, this new development limits the timeframe in bringing such issues as the judge has not made decisions on amending the original complaint of October of 2004. Though EEO arbitrator and EEOC states that some claims are untimely, they incorrectly believe that plaintiff then had full knowledge of EEO rules and standards for knowing what continuous violations were. Plaintiff was the Local president and had legal counsel for the chief steward. Plaintiff was never trained nor was she an expert on EEO laws. Therefore, the conclusions were faulty.

11. Plaintiff has applied for numerous promotional opportunities to the GS-14 level and to the GS-13/14 level (that would have long since provided promotion to the GS-14 level) and was passed over because of her race, religion, her sex, and certainly in retaliation for her prior EEO activities. In essence, the plaintiff had been "blackballed". Plaintiff had been qualified and rated as highly qualified for many of the opportunities. After plaintiff filed court case in October of 2004, her work was manipulated, and she was systematically rated down. This caused a potential strike against her in bids for other positions and promotions. The retaliation and harassment by the agency, in conjunction with NAGE, caused such mental duress that plaintiff had to take a leave of medical absence in August and September of 2005. This is not game. This is the plaintiff's life. The actions of the agency have caused great harm and pain

-8-

to the plaintiff and to her family. In fact, the Human Resource Department would not accommodate the plaintiff (that she be able to work from home) upon her return to work, instead inquiring as to whether plaintiff could still do her job at the GS-13 level. The agency did this while having a history of allowing white employees to work at home for many medical reasons. Plaintiff can do work at the GS-13 level, especially if the work environment is free from acts of discrimination, disparity, manipulation, retaliation, and hostility. Remedies have to be made, and plaintiff made whole.

12. To reiterate and to capture the entire history, to punish the plaintiff because of her sex, race, religion, color, and in retaliation for her EEO activity, the PBGC subjected plaintiff to a hostile work environment and numerous acts of retaliations including, but not limited to, having her workload expedited and manipulated, having flexiplace arrangements manipulated, subjecting her to religious slurs, racial slurs, manipulating the EEO process, denial of promotions, defamation of character with public posting and e-mail information (acquiescing with the National union and vice versa) in subsequent EEO arbitrations, and damage to plaintiff's reputation (by publicly posting a blackballing memo concerning her EEO activity to the entire agency, in addition to false allegations posted by the National Union at the agency and used by management officials.) In fact, the new EEO director, V. Snowbarger discriminates against plaintiff in his final agency decision. Is there a law that states that one can not speak of her religious convictions. The agency has Holiday parties and recognizes Christmas, Hannukah, and Kwanza, etc. Mr. V. Snowbarger discriminatorily refers to actions over which he had no first hand knowledge in his final agency decision (his reference to plaintiff's religious views in Union

newsletter). He took the testimony of an employee, who became a political enemy of the plaintiff, in order to help himself. Mr. V. Snowbarger makes references to politically motivated untruths about "supposed conversations" that plaintiff had with Mr. Dwayne Jeffers about homousexuality and premarital sex. He also incorrectly stated that plaintiff admitted to making incorrect statements while being on a "fishing expedition". These statements only serve to cause continued friction and hostility between employees (especially those of African American descent, as both Jeffers and plaintiffs are both African American.) To clarify the history, plaintiff was transferred to TPD-6 as part of an informal arrangement to not pursue filing a formal EEO grievance against Ray Collins in 1997 and 1998. Ray Collins was stated to have been a good friend of John Seal, the prior CMO, the prior head of HRD, and the prior EEO director. When plaintiff arrived in TPDD-6, she was already a GS-13 actuary, but Mr. Jeffers was concerned that plaintiff had taken his spot for a promotion. He expressed such concerns. In fact, several other employees of that division also asked plaintiff that question. Mr. Jeffers would visit plaintiff's office to complain about his work situation. As plaintiff eventually became Union president, she had to listen. Not only did she listen, but she mentored, trained, and helped Jeffers' with his work so that he could get his promotion. In fact, she protected his job, stating the Local would fight on his behalf, in several instances when managers advised her of his possibly being put on a Performance Improvement Plan (PIP). During the initial visits by Mr. Jeffers, he also engaged in conversations about the many "issues of young women", how women got their promotions on their backs, and how he seemingly used certain young woman for sexual pleasures. In an effort to keep peace in a new work environment, plaintiffl did not report Mr. Jeffers' behaviour or conversation, but instead tried to encourage him to respect himself and

young women, especially with the spread of AIDS. At no time, to the plaintiff's recollection, did plaintiff engage in any conversation with Jeffers' about homousexuality. She did encourage him to take care of himself physically and to mind his manners with females. I am sure these are common courtesies even Mr. Snowbarger's mother would have taught him. Plaintiff is labeled "opinionated", as is Mr. Snowbarger's decision. She simply has convictions. What would have been a surprise is if PBGC would have rightfully taken responsibility for its wrong actions, and or by simply making complete remedies for the harm PBGC has caused. (This statement of fact is not all inclusive – please see complaints and appropriate EEO decisions as attached.) (This statement also does not limit the managers involved as PBGC top management uses whomever it deems necessary to do its bidding.)

### Statement of Claims

**Discrimination and Retaliation**

13. In PBGC's treatment of plaintiff, as noted in paragraphs 6-12, defendants intentionally violated Title VII of Civil Rights Act of 1964, as amended, 42 U.S.C., by discriminating against the plaintiff based on her race, her sex, her religion, and her color. PBGC also retaliated against plaintiff for speaking out against PBGC's discriminatory patterns, and her EEO involvement.

14. As a result of PBGC's unlawful conduct in violating Title VII's prohibition against

employment discrimination, plaintiff has suffered and continues to suffer economic loss, promotional, award, and bonus opportunities, with attendant loss of pay and other benefits associated with promotions, bonuses, and awards for outstanding performance.

15. As a result of PBGC's unlawful conduct to in violating Title VII, and its efforts to prevent and stop plaintiff's involvement in the EEO process, PBGC has caused harm to reputation of plaintiff, not only in front of the PBGC community, but the community of actuaries (outside contractor actuaries who work at and for PBGC). This has caused the potential for loss of outside employment opportunities and economic gain. PBGC's treatment of plaintiff, as noted in paragraphs 6-12 above, by retaliating against the plaintiff has caused loss of employment outside of PBGC and mental damage.

16. As a result of PBGC's unlawful conduct in violating Title VII prohibition against retaliation for plaintiff's involvement in personal EEO counseling, protected civil rights activity, civil court activity, plaintiff has suffered and continues to suffer economic losses, lost promotional and bonus opportunities, with attendant loss of pay and other benefit associated with promotions, bonuses and awards for exceptional performance, damage in the form of the emotional distress, pain and suffering, as well as personal and professional harm.

**Defamation**

17. As a result of PBGC's unlawful conduct in violating Title VII prohibition against retaliation, the PBGC has also been involved in the effort to defame plaintiff and ruin her reputation, as threatened, with the help of the National Union.

18. During that same period, PBGC, acting through its agents, by agreement, and in collusion deprived Plaintiff of his rights by creating false testimony and false reports.

## DEPRIVATION OF CONSTITUTIONAL RIGHTS TO FREE SPEECH, ASSOCIATION, ASSEMBLY, PETITION, DUE PROCESS AND EQUAL PROTECTION

19. Plaintiff had equal rights under First, Fifth and Fourteenth Amendments to the United States Constitution to freedom to speak, to assemble, to associate, to petition for redress of grievances, to due process and to equal protection and be free from discrimination to his race, sex, color, and free of retaliation and reprisal.

### Prayer for Relief

(a) enter judgment in plaintiff's favor and against defendant on each of the claims contained in this civil action;

(b) award plaintiff compensatory damages against the defendant to the fullest extent allowable under Title VII or any other applicable law, with interest thereon;

(c) Order defendant to retroactively promote plaintiff to an appropriate GS-14 level position with full back pay and other benefits; reinstate appropriate leave and reimburse medical expenses and pay for pain and suffering;

(d) order defendant to correct all PBGC records, including plaintiff's official personnel folder, to accord with the relief order by the Court and to purge all references in such documents to this civil action and the administrative EEO complaint that proceeded it;

(e) enjoin defendant from future retaliation and discrimination against plaintiff;

(f) award plaintiff his costs of this action arid the administrative complaints that preceded it, including reasonable attorney's fees, with interest thereon, pursuant to 42 U.S.C. Secton 2000e-5(k);

(g) award such other and further relief as in the opinion of this Court the interests of justice may require.

## Jury Demand

Plaintiff hereby requests a trial by jury in the instant case on all issues of fact and on questioning pertaining to the level of damages to be awarded.

Respectfully submitted,

March 6, 2006

*[signature: Valda T. Johnson]*
VALDA T. JOHNSON, *Pro Se*
3600 Tupelo Court
Woodbridge, Virginia 22192
(703) 590 - 1137